UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────

MOSES LUGO and CHERYL SEATON,

                    Plaintiffs,                CIVIL CASE NO.: 1:19-cv-67-GLS-TWD

     -against-                      **MEMORANDUM OF LAW IN SUPPORT**
                                      **OF PLAINTIFFS' MOTION FOR**
THE CITY OF TROY, NEW YORK             **SUMMARY JUDGMENT**

                    Defendant.

───────────────────────────

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

DISABILITY RIGHTS NEW YORK
Amanda Pearlstein
Christina Asbee
725 Broadway, Ste. 450
Albany, NY 12207
(518) 432-7861
(585) 348-9823 (fax) (not for service)

# Table of Contents

I.   **Preliminary Statement** ................................................................................................. 1

II.  **Background and Procedural History** ......................................................................... 1

III. **Undisputed Material Facts** ....................................................................................... 3

   A.   The City of Troy .................................................................................................... 3

   B.   Effects of the Inaccessible Pedestrian Pathways on Plaintiffs ............................. 4

   C.   Expert Opinions of ADA-Noncompliance in the City........................................... 5

   D.   Insufficient or Nonexistent Remediation of Pedestrian Pathways........................ 6

   E.   The City's Responsibility to Maintain Its Pedestrian Pathways ........................... 7

   F.   Code Enforcement of ADA-Noncompliance........................................................ 7

   G.   Financial Allocations Related to Pedestrian Pathways ........................................ 9

IV. **Legal Standard**............................................................................................................ 10

   A.   Standard for Summary Judgment....................................................................... 10

   B.   Title II of the ADA and its Application to Pedestrian Pathways ....................... 11

V.   **Argument**...................................................................................................................... 14

   A.   The City's Failure to Maintain and Construct Accessible Pedestrian Pathways Denies Plaintiffs Meaningful Access to the City's Programs, Services, and Activities in Violation of the ADA and Section 504 ................................................................... 14

      1.   Plaintiffs are qualified individuals with disabilities.................................... 14

      2.   Plaintiffs have standing to pursue their claim. .......................................... 15

      3.   Plaintiffs were excluded from using the City's services, programs, or activities. ......... 17

      4.   Plaintiffs were excluded from using the City's services, programs, or activities because of their disability............................................................................................. 19

   B.   The City Disregarded Its Legal Requirement To Provide Plaintiffs With Accessible Sidewalks, Curb Cuts, and Crosswalks.................................................................. 19

      1.   The City's ADA transition plan is inadequate. ......................................... 19

      2.   The City has no plan to fund repairs and maintenance of inaccessible pedestrian pathways or to ensure remediated pedestrian pathways comply with the ADA. ................. 20

   C.   Plaintiffs Are Entitled to Summary Judgment .................................................... 22

VI.  **Conclusion** ................................................................................................................. 23

# Table of Authorities

## Cases

*Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir.2004).................................18
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 11, 22
*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) ........................................... 13, 18
*Berardi v. City of Pekin, Illinois*, No. 1:18-CV-01438, 2021 WL 1535409 (C.D. Ill. Apr. 19, 2021) ....... 13
*Bowen v. Nat'l R.R. Passenger Corp.*, 363 F. Supp. 2d 370 (N.D.N.Y. 2005)..............................................10
*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007).......................10
*Camarillo v. Carrols Corp.*, 518 F.3d 153 (2d Cir.2008).................................................................16
*Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931 (N.D. Ind. 2009) .................................. 13, 18
*Ferguson v. Shu Ham Lam*, 74 A.D.3d 870 N.Y.S.2d 101 (2010) ...........................................................14
*First Nat. Bank of Ariz. v. Cities Serv. Co.*, U.S. 253 (1968)................................................................11
*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) .................................................. 16, 18
*Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155 (D. Colo. 2020) ..............................................13
*Hamer v. City of Trinidad*, 924 F.3d 1093 (10th Cir.)........................................................................16
*Hausser v. Giunta*, 88 N.Y.2d 449, 452–453, 646 N.Y.S.2d 490, 669 N.E.2d 470 (1996) ......................14
*Henrietta D. v. Bloomberg*, 331 F. 3d 261 (2d. Cir. 2003)....................................................................14
*Hevia v. Smithtown Auto Body of Long Island, Ltd.*, 91 A.D.3d 822, 937 N.Y.S.2d 284 (2012)..............14
*Houston v. Marod Supermarkets Inc.*, 733 F.3d 1323 (11th Cir. 2013) ...............................................15
*Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) ...............................12
*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1997)........................................................................12
*Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184 (2d Cir. 2013)........................................... 16, 17
*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)......................................................................13
*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)............................................... 15, 17
*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)................................................................................12
*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir.2002) .................................................16
*Rodriquez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995 ..................................................................11
*Salinas v. City of New Braunfels*, 2006 WL 3751182 (W.D. Tex. 2006).................................................13
*Scharff v. County of Nassau*, No. 10-CV-4208, 2014 WL 2454639 (E.D.N.Y. June 2, 2014)....... 11, 13, 23
*Talanda v. KFC Nat. Mgt. Co.*,140 F.3d 1090 (7th Cir. 1998), *cert. denied*, 525 U.S. 869 (1998) .......... 12
*Tcherepnin v. Knight*, 389 U.S. 332 (1967)........................................................................................12
*Tennessee v. Lane*, 541 U.S. 509 (2004)..............................................................................................11
*Tucker v. Hardin County*, 448 F.Supp.2d 901 (W.D. Tenn. 2006).......................................................13
*Tyler v. City of Manhattan*, 857 F. Supp. 800 (D. Kan. 1994).............................................................20
*Zervos v. Verizon, New York, Inc.*, 252 F.3d 163 (2d Cir. 2001)..........................................................12

## Statutes

29 U.S.C. § 794 (b)(1)(B) ...................................................................................................................18
29 U.S.C. § 794(a) ...............................................................................................................................11
42 U.S.C. § 12101(b)(1) ......................................................................................................... 11, 23
42 U.S.C. § 12131(1)(A)......................................................................................................................18
42 U.S.C. § 12131(2) ...........................................................................................................................14
42 U.S.C. § 12132...................................................................................................................... 1, 11, 22

42 U.S.C. §§ 12131(1)(A) ...................................................................................... 22

42 U.S.C. § 12102(1) ........................................................................................... 15

**Rules**

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................ 11, 22

**Regulations**

28 C.F.R. § 35.105 .............................................................................................. 20

28 C.F.R. § 35.130(a) .......................................................................................... 11

28 C.F.R. § 35.133(a) .......................................................................................... 13

28 C.F.R. § 35.149 .............................................................................................. 22

28 C.F.R. § 35.150(a) .......................................................................................... 12

**Other Authorities**

H.R.Rep. No. 101–485, pt. 2, at 84 (1990) ......................................................... 18

## I.       Preliminary Statement

Sidewalks, curb cuts, and crosswalks ("pedestrian pathways," collectively) in the City of Troy, New York ("the City") are inaccessible to Plaintiffs, two individuals with mobility disabilities who require motorized wheelchairs to navigate the City. The Defendant's approach to maintenance and construction of its pedestrian pathways violates Title II of the Americans with Disabilities Act ("ADA") because the pathways do not meet even the bare minimum accessibility standards. Conditions of the pedestrian pathways throughout the City are hazardous, frequently leaving Plaintiffs no choice but to wheel into the streets or avoid going out altogether for fear of becoming injured or stranded.

The City's pedestrian pathways are poorly maintained and rife with physical barriers including cracks and potholes, obstacles in the paths of travel, insufficient or nonexistent curb cuts, and unaddressed accumulations of ice and snow in the winter. These barriers make the City's pedestrian pathways inaccessible by legal standards and dangerous for Plaintiffs to navigate. Defendant is aware of the inaccessibility of its pedestrian pathways throughout the City, but has failed to fix the issues. The City's blatant disregard for maintaining and constructing ADA-compliant pedestrian pathways so they are readily accessible and usable by Plaintiffs, people with disabilities, violates the ADA. 42 U.S.C. § 12132.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There are no contested issues of material fact in this matter, and Plaintiffs are therefore entitled to summary judgment.

## II.      Background and Procedural History

Plaintiffs Moses Lugo and Cheryl Seaton are people with mobility disabilities who reside in the City. Mr. Lugo has multiple sclerosis and relies on a power wheelchair for mobility.

Statement of Material Facts ("SMF") ¶ 13. Ms. Seaton also uses a power wheelchair because she is unable to walk due to a leg amputation. SMF ¶ 29. In the winter of 2017, both Mr. Lugo and Ms. Seaton suffered physical injury and property damage to their wheelchairs because of the inaccessible and dangerous conditions of the City's pedestrian pathways. Mr. Lugo was thrown to the ground, and his wheelchair was damaged, when he hit a pothole in a crosswalk on a City street. He was stuck at home for over a month while the wheelchair was repaired. SMF ¶ 20-22. Ms. Seaton's wheelchair was damaged and its battery destroyed when she hit a large gap in the sidewalk. SMF ¶ 36. Unable to move, she became stranded and had to call her family to retrieve her. SMF ¶ 36. Her wheelchair needed to be replaced, a process which took over two and a half months. SMF ¶ 37. Ms. Seaton was unable to leave her home while she waited for a new wheelchair. SMF ¶ 38. Plaintiffs both suffered pain, isolation, and emotional distress from these incidents, and the damage to their chairs severely limited their independence while they waited for their chairs to be repaired or replaced.

In February 2018, Disability Rights New York ("DRNY") met with Patrick Madden, the Mayor of the City of Troy; John Salka, the City of Troy ADA Coordinator; and James Caruso, the City of Troy Corporation Counsel, to address the inaccessibility of the City's pedestrian pathways. SMF ¶ 5. DRNY provided examples and photographs of the noncompliant pedestrian pathways. SMF ¶ 6. DRNY requested that the City remedy the inaccessible pedestrian pathways and asked the City to create a transition plan including a proposed budget, areas to be prioritized, and timelines for implementation of the transition plan. SMF ¶ 6. The City did not commit to fixing the barriers throughout the pedestrian pathways. SMF ¶ 7. On January 18, 2019, DRNY filed this lawsuit on behalf of Mr. Lugo and Ms. Seaton.

Since the initiation of this litigation, Plaintiffs and Defendant have engaged in lengthy discovery and an unsuccessful attempt to settle the case. SMF ¶ 9. It remains uncontroverted that Troy's pedestrian pathways continue to be inaccessible and ADA-noncompliant.

### III.     Undisputed Material Facts
#### A.  *The City of Troy*

The City is home to a diverse population of over 51,000 residents. SMF ¶ 42. It is made up of a historical central downtown, residential neighborhoods, parks, and waterfront, and offers public events for the community. SMF ¶ 44-45. The City's higher-density "Downtown Business District" is bounded by Federal Street on the north, Ferry Street on the south, 6th Avenue on the east, and Front Street on the west. SMF ¶ 43. The remainder of the City outside of the Downtown Business District consists primarily of residential areas. Both the Downtown Business District and the largely residential areas beyond its bounds are within the City's jurisdiction, and the City is responsible for maintaining accessible pedestrian pathways in all parts of the City.

The City is a public entity. SMF ¶ 3.  It provides services, programs, and activities to its residents and those who work, travel, or enjoy the City. SMF ¶ 44. It receives both federal and state funding to complete projects to build and maintain its roads, sidewalks, curb cuts, and crosswalks. SMF ¶ 89-91. The City operates a Public Works Department that "consists of five bureaus whose responsibilities include but are not limited to repairing . . . roads, plowing the snow, maintaining city buildings and vehicles, installing traffic devices and picking up the city refuse." SMF ¶ 48. The City's Code Enforcement Bureau is responsible for enforcing all state and local codes and the City's Zoning Ordinance in the City. SMF ¶ 49.

B. *Effects of the Inaccessible Pedestrian Pathways on Plaintiffs*

Mr. Lugo and Ms. Seaton are decades-long residents of the City and intend to remain in the City for the foreseeable future. SMF ¶ 11, 27. Both Mr. Lugo and Ms. Seaton are people who rely on motorized wheelchairs for mobility. SMF ¶ 14, 29.

On December 16, 2017, Mr. Lugo was traveling on the south side of Federal Street when his power wheelchair slid into a pothole in the sidewalk with such force that the front right wheel snapped off and he was ejected from the chair, despite wearing a seatbelt. SMF ¶ 20. Mr. Lugo crawled back to his wheelchair and traversed in the damaged wheelchair back to his apartment, where he was confined during the one month period it took for his wheelchair to be repaired. SMF ¶ 21-22.

During the 2017-2018 winter season, Ms. Seaton was traveling in the City along 2nd Avenue towards 114th Street when she hit a large gap in the pedestrian pathway between the sidewalk and the road while crossing 113th Street. SMF ¶ 36. The impact cracked her footrest and damaged the wheelchair's battery, rendering it inoperable. SMF ¶ 36. Ms. Seaton experienced pain in her back from the force of impact. SMF ¶ 36. A family member rescued Ms. Seaton from where she was stuck. Her wheelchair took two and a half months to replace, during which time she was unable to leave her home. SMF ¶ 36-37.

Based on their shared experience, Mr. Lugo and Ms. Seaton are afraid of becoming trapped and injured navigating the City because many pedestrian pathways throughout the City remain inaccessible. SMF ¶ 25, 39. They are often unable to use the City's pedestrian pathways because of poor maintenance and physical barriers, including impassable snow and ice during winter months. SMF ¶ 17-18, 32-33. When a sidewalk or curb cut is not accessible, Mr. Lugo and Ms. Seaton must drive their wheelchairs into the street, putting them at great risk of injury from a motor vehicle and causing them to encounter hostility from drivers. SMF ¶ 19, 34-35. The

inaccessibility has severely limited Mr. Lugo and Ms. Seaton's independence. SMF ¶ 23-24, 40.

The Plaintiffs would use more of the pedestrian pathways throughout the City if not for the

barriers they know or anticipate they will face. SMF ¶ 25, 41.

C. *Expert Opinions of ADA-Noncompliance in the City*
Expert witness for the Plaintiffs, architect and accessibility consultant Steven Kirk

Mason, conducted a Pedestrian Access Survey of Troy's Downtown Business District in

November 2020. SMF ¶ 107. Plaintiffs' expert photographed, measured, and evaluated 60 sites

within the City's downtown area, and prepared a report of his findings. SMF ¶ 108. In the report,

Plaintiffs' expert made recommendations for the City to bring each site into compliance with the

ADA. SMF ¶ 108. The report concluded that "[t]he downtown area surveyed is generally not

accessible." SMF ¶ 109. Plaintiffs' expert reported accessibility barriers throughout the

downtown area including "sidewalks with abrupt changes in level, tilted sidewalks, steep curb

ramps, broken curb ramps, curbs that lack curb ramps, and steep driveway crossings." SMF ¶

110. Plaintiffs' expert prepared a rebuttal report that concluded additional areas in the City are

inaccessible. SMF ¶ 119, 123-24.

Defendant identified architectural consultant Michael Hurtt as an expert. SMF ¶ 111. Mr.

Hurtt prepared a Disclosure, an Amended Disclosure, and a Second Amended Disclosure. SMF ¶

112. Each of these disclosures identified several locations in the City that Mr. Hurtt inspected.

*Id.* Unlike Plaintiff's expert, Mr. Hurtt's inspections consisted only of photographs of sites

described by Plaintiffs as inaccessible, and at only one site did Mr. Hurtt take measurements.

SMF ¶ 113-14.

Mr. Hurtt concluded that the locations he inspected were not compliant with the ADA.

SMF ¶ 115-24.  He agreed with the accuracy of the measurements made in Plaintiffs' expert's

report and rebuttal, showing that the sidewalks, curb cuts, and crosswalks surveyed across the

City do not comply with the accessibility guidelines set forth in the ADA. SMF ¶ 115-16. Mr. Hurtt specifically discussed some of the locations where Mr. Lugo and Ms. Seaton encountered inaccessible pedestrian pathways, and explained that ongoing accessibility barriers exist at those locations. SMF ¶ 117-24.

### D. Insufficient or Nonexistent Remediation of Pedestrian Pathways

In his disclosures, Mr. Hurtt attested to several locations that had been identified as inaccessible by Plaintiffs that had not yet been remediated. For example, he identified the area outside Dinosaur Barbeque as inaccessible and estimated it would cost $2,500 to remediate. Mr. Hurtt also identified the food pantries near Hoosick Street as inaccessible in areas, for which he estimated the replacement of two sidewalk panels would cost less than $1000. SMF ¶ 117.

Regarding the location of Mr. Lugo's 2017 accident, Mr. Hurtt confirmed that as of September 2021, while any defect in the driveway crossing has been corrected by repaving, there continued to be an ADA-noncompliant "depressed curb," and that this continued to render the path of travel inaccessible. SMF ¶ 118. On September 26, 2021, Plaintiffs' expert reviewed and measured the sidewalk and curb ramps at that same location and identified nine distinct areas in need of remediation, including inaccessibly steep slopes, level changes, and potholes. SMF ¶ 119.

Mr. Hurtt also confirmed that multiple additional locations identified by Plaintiffs as inaccessible remained inaccessible as of September 2021. These locations include the curb cut on Hutton Street outside City Hall, where Mr. Lugo was unable to navigate his wheelchair around a traffic signal pole, the Centers for Economic Opportunity on 5th Avenue, which Ms. Seaton had identified as inaccessible, and the sidewalk on Riverside Park next to the Dinosaur Barbeque. SMF ¶ 120-122.

Plaintiffs' expert identified inaccessibly steep slopes outside the Frear Building, which Mr. Hurtt concluded are "traversable" but not accessible pursuant to the ADA. SMF ¶ 123. Mr. Hurtt and Plaintiffs' expert both concluded that the ramp outside of City Hall was not accessible. SMF ¶ 124.

### E. *The City's Responsibility to Maintain Its Pedestrian Pathways*

The City is responsible for the upkeep and maintenance of pedestrian pathways within its jurisdiction. SMF ¶ 46. With limited exceptions provided in the City Code or other applicable laws, the Code requires that nothing "shall in any manner encumber or obstruct such street or sidewalk or in any way impede, restrict or interrupt the full and free use thereof[,]" and "[p]ublic passage must be maintained." SMF ¶ 47.

The City is aware of the ADA-noncompliant pedestrian pathways that exist within the core downtown area and throughout the City. In its 2020-2024 Consolidated Action Plan submitted to the U.S. Department of Housing and Urban Development (HUD) as a condition of the receipt of federal Community Planning and Development (CPD) funds, the City admitted "our sidewalks and streetscapes are in need of ADA improvements." SMF ¶ 50.

### F. *Code Enforcement of ADA-Noncompliance*

The City does not have a "plan or a process or a system" of managing barriers such as cracked or non-level sidewalks in the downtown area. SMF ¶ 72. Moreover, the City does not proactively identify pedestrian pathway violations and instead relies on citizen complaints to identify inaccessible locations. SMF ¶ 73-74. Following a citizen complaint, a Code Enforcer will be sent to conduct an inspection – although there is no requirement that an inspection be conducted within a specified period of time. SMF ¶ 75. If a violation is confirmed, the Code Enforcer will issue, and may continue issuing, notices of violation requesting remediation by the property owner. SMF ¶ 76. "[A]t the discretion of the code officer doing the inspection" and on a

"case by case basis," the Code Enforcer may issue an appearance ticket for ongoing or subsequent violations. SMF ¶ 77. At the property owner's court appearance, a judge may issue a fine. SMF ¶ 80. Following the issuance of a fine, a Code Enforcer may, at their discretion, grant an extension, issue a final notice reminding the property owner of their obligation to remediate, or issue another appearance ticket. SMF ¶ 81. The City will rectify ongoing or repeat violations only after the violation is deemed "a serious public safety issue." SMF ¶ 84. However, there is no set timeframe for such intervention, nor is there a codified definition of what constitutes a "serious public safety issue." SMF ¶ 85. Responses from the City suggest that ADA-noncompliance of a pedestrian pathway, alone, does not trigger the City to determine the violation to be a "serious public safety issue." SMF ¶ 84-86. The City could not recall a time over the past five years when it fixed a sidewalk, curb cut, or crosswalk known to be ADA-noncompliant on a public right of way on privately owned property. SMF ¶ 86.

Troy City Code requires that property owners remove snow and ice from the sidewalks and pedestrian rights of way on or adjacent to their property by 10:00 AM after the day or night in which snow has fallen. SMF ¶ 59. Property owners who fail to timely and properly remove snow and ice may be fined seventy-five dollars for a "walkways, snow, and ice" ("WIS") violation. SMF ¶ 60. WIS violations are a frequently-reported occurrence, with eight hundred and eleven (811) such violations reported to the Defendants between January 2014 and April 2021; an average of over one hundred WIS violations reported per winter. SMF ¶ 61. Following snowstorms, a "good amount of properties" do not comply with the Code regarding WIS violations and the owners do not remedy the violations within the required time. SMF ¶ 62.

The City is notified of WIS violations through citizen complaints made either by phone to the Code Enforcement Department, the Mayor's office, or the public works dispatcher; by email;

or by using the City's online complaint form. SMF ¶ 63. WIS violation citizen complaints made by phone are stored on a voicemail system that personnel do not access except when physically in the office. When snowfall hinders personnel from traveling to the office, voicemail messages reporting WIS violations are not logged or responded to until personnel return to the office after inclement weather has subsided. SMF ¶ 64. The City also refrains from using Code Enforcement Department vehicles for up to two days after a heavy snowstorm, and thus does not identify or remedy unreported snow or ice violations during that time. SMF ¶ 71.

The City's Public Works Department is the department responsible for the physical removal of snow and ice and has the ability to rectify WIS violations using its own funds and thereafter charge the cost to the property owner. SMF ¶ 68. However, the Code Enforcement Department has no control over when the Public Works Department clears snow on private property if the property owner fails to remedy the violation. Neither the Public Works Department nor the Code Enforcement Department keeps a record of when the City removes snow and/or ice from private property. SMF ¶ 71.

G. *Financial Allocations Related to Pedestrian Pathways*

The City relies on funding from a number of different sources, none of which is specifically designated by the City to be used for remediating ADA-noncompliant pedestrian pathways. SMF ¶ 88. The City provided no evidence that funds generated by fines for pedestrian pathway violations are designated for ADA-noncompliant pedestrian pathway remediation. SMF ¶ 95.

The City receives funding from New York State through the Consolidated Local Street and Highway Improvement Program ("CHIPS"), which provides reimbursement for local cash expenditures for highway-related capital projects. SMF ¶ 90. CHIPS funds used to remediate ADA-noncompliant pedestrian pathways have only been designated when the pedestrian

9

pathways are adjacent to a street or streets that are within the scope of the street repair project. SMF ¶ 96.

The City receives annual grants from the federal government through the Community Development Block Grant ("CDBG") Program. The CDBG program requires the City to submit a Consolidated Plan, created by the City's Community Development Department, outlining "how we intend to spend that money." SMF ¶ 89. However, there is no mention of remediation efforts targeting ADA-noncompliant sections of pedestrian pathways in the City's Consolidated Plan. SMF ¶ 50. No CDBG-funded curb cut or sidewalk projects in the core downtown area have been completed since 2015. SMF ¶ 102. The City does not supplement the CDBG grant funds with its own budget allocation. SMF ¶ 100.

The City received a $1.7 million bond for street repairs for a five-year period, spanning 2020 to 2024. SMF ¶ 103. For funds that are not grant-generated, such as this bond, the City evaluates how to allocate its funding for street repairs on an ad hoc basis, using "a rating scale to determine the condition of the streets . . . And [the City] would choose the worst, as many of the worst streets as [the City] can to do the remediation." SMF ¶ 106. ADA pedestrian pathway accessibility is not identified as a component of this rating scale. SMF ¶ 106.

## IV. Legal Standard
### A. *Standard for Summary Judgment*

Summary judgment is appropriate when there is no genuine issue of any material facts, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007).  The party moving for summary judgment has the burden of establishing "that no genuine issue of material fact exists and that the undisputed facts establish [a party's] right to judgment as a matter of law." *Bowen v. Nat'l R.R. Passenger Corp.*, 363 F. Supp. 2d 370, 373 (N.D.N.Y. 2005) (*quoting*

*Rodriquez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Summary judgment is required unless the nonmoving party can show sufficient evidence "for a jury to return a verdict for that party." *Id.* at 249, *citing First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968). If the evidence presented by the nonmoving party is merely "colorable" or is not significantly probative, summary judgment may be granted. *Id* at 250.

The moving party must present specific and detailed facts and support those facts by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If the evidence presented adequately demonstrates that there is no genuine issue of material fact, the moving party is entitled to summary judgment. *Id.*

### B.  Title II of the ADA and its Application to Pedestrian Pathways

Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA prohibits discrimination against individuals with disabilities in three major areas of public life: (1) employment and hiring (Title I); (2) access to public services, programs, and activities (Title II); and (3) public accommodations (Title III). *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004); *See also Scharff v. Cty. of Nassau*, No. 10 CV 4208 DRH AKT, 2014 WL 2454639, at *5 (E.D.N.Y. June 2, 2014).

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 [ADA]; 29 U.S.C. § 794(a) [Section 504]*; see also* 28 C.F.R. § 35.130(a).

The ADA requires that, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

The ADA "is a broad sweeping protective statute requiring the elimination of discrimination against individuals with disabilities." *Talanda v. KFC Nat. Mgt. Co.,*140 F.3d 1090, 1095 (7th Cir. 1998), *cert. denied*, 525 U.S. 869 (1998). It is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). The statutory language of Title II of the ADA, which prohibits public entities from denying individuals with disabilities the "benefits of" any "services, programs, or activities," has been recognized by the Supreme Court as unambiguously broad. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("Our conclusion that the text of the ADA is not ambiguous.").

Courts have been clear that the phrase "service, program, or activity" within the ADA must be interpreted expansively, and include pedestrian pathways operated by the City. *Johnson v. City of Saline*, 151 F.3d 564, 569-570 (6th Cir. 1997) (the court concluded that the phrase "encompasses virtually everything that a public entity does" and the term "'activities,' on its face, suggests great breadth and offers little basis to exclude any actions of a public entity [from the ADA]"). The Second Circuit concluded that "'programs, services, or activities' . . . is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context[.]" *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 45 (2d Cir. 1997), *superseded on other grounds, Zervos v. Verizon*, *New York, Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001). There is little basis to exclude any action of a public entity when concluding whether something a government offers to the public is within the definition of an "activity" pursuant to

Title II of the ADA. *Id.* "[T]he ADA's broad language brings within its scope 'anything a public entity does[.]'" *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (*internal quotation marks and citations omitted*); *see also, e.g., Salinas v. City of New Braunfels*, 2006 WL 3751182, *4 (W.D. Tex. 2006); *Tucker v. Hardin County*, 448 F.Supp.2d 901, 906 (W.D. Tenn. 2006).

City sidewalks, curb cuts, and crosswalks fall under the realm of a "program, service or activity" because maintaining public sidewalks is "a normal function of a city and without a doubt something that the [city] does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002). Municipalities have "exclusive jurisdiction and responsibility for [their] sidewalks and an obligation to maintain [their] sidewalks so that the sidewalk system, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 941 (N.D. Ind. 2009)(internal quotation marks omitted); *see also Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1172 (D. Colo. 2020) ("The statutory text, as well as its structure, legislative history, and broader statutory context, make clear that sidewalks [, as well as their construction, maintenance, and alteration] are a service, program, or activity, as those terms are plainly and ordinarily understood."); *Berardi v. City of Pekin, Illinois*, No. 1:18-CV-01438, 2021 WL 1535409, at *2 (C.D. Ill. Apr. 19, 2021); *Scharff v. County of Nassau*, No. 10-CV-4208(DRH)(AKT), 2014 WL 2454639, *7 (E.D.N.Y. June 2, 2014) (holding that the installation and maintenance of crossing signals is a service, program, or activity within the meaning of Title II.).

The ADA requires municipalities to "maintain in operable working condition" public features including sidewalk systems. 28 C.F.R. § 35.133(a). Municipalities are, as a general matter, responsible for correcting "negligent maintenance of or the existence of dangerous and defective conditions [on] public sidewalks." *Hausser v. Giunta,* 88 N.Y.2d 449, 452–453, 646

N.Y.S.2d 490, 669 N.E.2d 470 (1996); *see also Ferguson v. Shu Ham Lam,* 74 A.D.3d 870, 903

N.Y.S.2d 101 (2010); *Hevia v. Smithtown Auto Body of Long Island, Ltd.*, 91 A.D.3d 822, 822,

937 N.Y.S.2d 284, 285 (2012).

## V.      Argument

The City violated and continues to violate Title II of the ADA and Section 504's

prohibitions against discrimination by failing to provide Plaintiffs with pedestrian pathways

throughout Troy.[1]

A.   *The City's Failure to Maintain and Construct Accessible Pedestrian Pathways Denies
Plaintiffs Meaningful Access to the City's Programs, Services, and Activities in Violation
of the ADA and Section 504.*

Plaintiffs are unable to access the pedestrian pathways throughout the City because the

sidewalk system and all the parts in between are rife with insurmountable barriers for Plaintiffs

traveling by wheelchair. Defendants are in violation of Title II of the ADA and Section 504

because they failed to provide Plaintiffs with accessible pedestrian pathways throughout the City.

1.   Plaintiffs are qualified individuals with disabilities.

It is uncontested that both Mr. Lugo and Ms. Seaton are qualified individuals with

disabilities. The ADA defines "qualified individual with a disability" as "an individual with a

disability who, with or without reasonable modifications to rules, policies, or practices, the

removal of architectural, communication, or transportation barriers, or the provision of auxiliary

aids and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The

definition of "disability" under the ADA is "(A) a physical or mental impairment that

---

[1] ADA and Section 504 claims are generally treated by the courts identically, so Section 504 is implicit where this
brief references the ADA. *Henrietta D. v. Bloomberg*, 331 F. 3d 261, 272 (2d. Cir. 2003) "[ADA and Section 504]
claims [are generally treated] identically."

substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3)).” 42 U.S.C. § 12102(1).

Plaintiffs are two individuals who rely on motorized wheelchairs to travel. Mr. Lugo has multiple sclerosis and has limited ability to walk. SMF ¶ 13-14.  Ms. Seaton has a mobility disability caused by the loss of one of her legs. SMF ¶ 29. Their disabilities are material facts not in dispute.

2.  <u>Plaintiffs have standing to pursue their claim.</u>

A plaintiff must demonstrate standing under Article III of the U.S. Constitution by showing an injury in fact that is 1) “concrete, particularized, and actual or imminent”; 2) “fairly traceable to the challenged action”; and 3) “redressable by a favorable ruling.” *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). A plaintiff seeking injunctive relief under the ADA must allege facts giving rise to an inference of a “real and immediate threat of future injury.” *Houston v. Marod Supermarkets Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013). Mr. Lugo and Ms. Seaton’s claim satisfies the standing requirement because they have demonstrated both injury in fact and a real and immediate threat of future injury.

A plaintiff has standing in an ADA case alleging inaccessible pedestrian pathways by showing that they suffered an injury, and that they are likely to use the pedestrian pathways in the future. The Second Circuit has found that in an ADA claim, a denial of access is sufficient to constitute an “injury in fact,” so long as the location is one to which the plaintiff intends to return. “In the ADA context, we have . . . found standing (and therefore an injury in fact) where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past

frequency of plaintiff's visits and the proximity of [the subject location] to plaintiff's home, that plaintiff intended to return to the subject location." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir.2008) (*per curiam*) (*citing Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137–38 (9th Cir.2002)); *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013); *see also Hamer v. City of Trinidad*, 924 F.3d 1093, 1109–10 (10th Cir.), *cert. denied sub nom. City of Trinidad, Colorado v. Hamer*, 140 S. Ct. 644, 205 L. Ed. 2d 386 (2019) (finding that the plaintiff had standing because he resided in the City of Trinidad, and asserted an intent to use the pedestrian pathways where the violations are alleged to be occurring.). A plaintiff is not required to seek out and experience every inaccessible part of a pedestrian pathway to have standing for the claim. *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011) ("a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way.").

Mr. Lugo and Ms. Seaton have experienced both actual injury, and the immediate threat of future injury. Due to the inaccessible pedestrian pathways, Mr. Lugo was thrown from his wheelchair to the ground, causing damage to his chair that necessitated extensive repairs. SMF ¶ 20-22. Ms. Seaton's encounter with a gap between the crosswalk and curb cut damaged her wheelchair beyond repair, causing her physical pain from the impact and emotional distress from being stuck helpless at the mercy of strangers and her family. SMF ¶ 36-38. Both Plaintiffs were confined to their homes while waiting for their wheelchairs to be fixed or replaced. Physical pain, emotional distress, property damage, and confinement to one's home are clear examples of "concrete" and "particularized" injuries. There is no doubt that both Mr. Lugo and Ms. Seaton have suffered an "injury in fact." *Frame* at 236.

The threat of future injury to Plaintiffs is not merely speculative, but actual. As residents who intend to remain in the City for the foreseeable future, future injury is likely because they intend to use the pedestrian pathways in the City nearly every time they leave their homes. SMF ¶ 11, 16, 27, 30-31. Both Plaintiffs have demonstrated that they have been deterred from using the City's pedestrian pathways due to their inaccessibility. SMF ¶ 23, 25, 39-41. The Second Circuit determined conclusively in *Kreisler v. Second Ave. Diner Corp.* that deterrence alone constitutes an injury in ADA cases. *Kreisler* at 188.[2] As the City continues to violate Title II of the ADA by failing to maintain accessible pedestrian pathways, Plaintiffs will continue to face significant risks of physical injury and emotional distress while attempting to traverse the City in their wheelchairs.

There is no question that Plaintiffs' injuries are "traceable to the challenged action" and "redressable by a favorable ruling." *Monsanto* at 149. The City's failure to enforce provisions of its City Code and properly construct and maintain its pedestrian pathways has resulted in inaccessible and dangerous pedestrian pathways for Plaintiffs. The injury can be redressed by a favorable ruling ordering the City to bring its pedestrian pathways into compliance with the ADA.

   3.   Plaintiffs were excluded from using the City's services, programs, or activities.

It is undisputed that Plaintiffs were and are unable to make use of the City's pedestrian pathways due to the inaccessible and hazardous conditions of the sidewalks, curb cuts, and crosswalks. The City has excluded Plaintiffs from its program in violation of the ADA.

---

[2] "To the extent *Camarillo* left unresolved the question of whether deterrence constitutes an injury under the ADA, we now adopt the Ninth Circuit's ruling in *Pickern* and hold that it does. *See Pickern*, 293 F.3d at 1137–38. In the context of the ADA, the fact that the wheelchair-inaccessible entrance deterred Kreisler from accessing the [subject location] established a concrete and particularized injury; Kreisler need not attempt to overcome an obvious barrier." *Kreisler* at 188.

The ADA is to be construed broad enough so that the phrase "services, programs, or activities" encompasses public sidewalks within the scope of a city's services, programs, or activities. 42 U.S.C. § 12131(1)(A); 29 U.S.C. § 794 (b)(1)(B); *Culvahouse* at 939–40. "Congress envisioned that the ADA would require that local and state governments maintain disability-accessible sidewalks[.]" *Frame* at 437 *citing* H.R.Rep. No. 101–485, pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 ("The employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.").

Congress and the courts recognize the ADA's broad purpose is imperative to its worth; requiring a public entity to maintain and construct accessible pedestrian pathways ensures "individuals the means necessary to acquire access to these services." *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir.2004) ("Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled."). Maintaining its public sidewalks is something the City is responsible for doing as part of its government function. *Barden* at 1076 .

Plaintiffs have been unable to navigate the City in the way they would like because they use wheelchairs and cannot navigate barriers on the City's pedestrian pathways.  SMF ¶ 15-19, 23-25, 29-35, 39-41. On many occasions, they have made the difficult choice to remain at home or rely on others to drive them because they are unable to navigate the City's obstacle-filled pedestrian pathways. SMF ¶ 23-24, 39-41. After inclement winter weather, the City has failed to keep its pedestrian pathways free of snow and ice, and has received hundreds of citizen complaints. Yet, the City continues to ignore its responsibility to clear the pedestrian pathways for Plaintiffs. The City failed to remove barriers of its own creation and those that have

18

accumulated over time. The City has failed to provide Plaintiffs pedestrian pathways that are accessible and comply with the ADA.

4. <u>Plaintiffs were excluded from using the City's services, programs, or activities because of their disability.</u>

Plaintiffs must use wheelchairs because of their disabilities. They cannot navigate barriers that exist because the City's pedestrian pathways are ADA-noncompliant. SMF ¶ 15-19, 23-25, 29-35, 39-41. Attempting to navigate the City's pedestrian pathways is potentially life-threatening for Plaintiffs. Plaintiffs may be unable to move their wheelchairs if they become stuck in a gap between sidewalk panels. SMF ¶ 36. Plaintiffs may fall out of their wheelchairs if the curb cut grade is too steep. SMF ¶ 32.  Plaintiffs could get hit by a vehicle if their wheelchairs cannot navigate an inaccessible crosswalk. SMF ¶ 19, 34-35. Plaintiffs' wheelchairs cannot navigate barriers caused by snow or ice. SMF ¶ 18, 33. The City discriminated and continues to discriminate against Plaintiffs because it operates its sidewalks program in an inaccessible manner, unnavigable by Plaintiffs in their wheelchairs. The City has denied and continues to deny Plaintiffs the benefits of the public program of pedestrian pathways because of their disability.

B. *The City Disregarded Its Legal Requirement To Provide Plaintiffs With Accessible Sidewalks, Curb Cuts, and Crosswalks.*

The City has failed to comply with any reasonable interpretation of ADA accessibility requirements. It failed to do the bare minimum necessary to provide Plaintiffs with accessible pedestrian pathways.

1. <u>The City's ADA transition plan is inadequate.</u>
The City is currently operating under an incomplete transition plan that does not contemplate pedestrian pathway accessibility. SMF ¶ 54-55. The ADA requires that the City complete a self-evaluation to "evaluate its current services, policies, and practices, and the

effects thereof," that do not meet minimum accessibility requirements. 28 C.F.R. § 35.105. The

City must then "proceed to make the necessary modifications" as identified in a transition plan to

remedy barriers that prevent people with disabilities from accessing what the City offers. *Id.* The

self-evaluation cannot pick and choose what programs, services, activities, or locations the City

wants to evaluate – it must comprehensively assess all of what it offers. *Tyler v. City of*

*Manhattan*, 857 F. Supp. 800, 816 (D. Kan. 1994) (a public entity may not exclude a particular

service, program, or activity from its self-evaluation and planning process[.]).

 The City's disclosed ADA self-evaluation and transition plan contains only vague and

limited information regarding Troy's pedestrian pathways, and no concrete framework for

systemic accessibility improvements. In its transition plan, the City conducted a physical

assessment of only "specific city facilities and limited number of recreational parks." SMF ¶ 54.

The list of assessed sites within the City's self-evaluation did not include any surveys of the

City's pedestrian pathways. SMF ¶ 54**.** The City provided no timeline to complete

"identification, mapping and condition assessment" of the City's pedestrian pathways, let alone

subsequent steps of remediation. SMF ¶ 55. The City offered no plan or information about

processes in place for managing barriers or making repairs to inaccessible pedestrian pathways.

SMF ¶ 55. Simply put, the City has no intention of making its pedestrian pathways accessible.

 2.  <u>The City has no plan to fund repairs and maintenance of inaccessible pedestrian</u>
 <u>pathways or to ensure remediated pedestrian pathways comply with the ADA.</u>

 The City has never designated sufficient funding exclusively for remediation of ADA-

noncompliant pedestrian pathways. SMF ¶ 88. The ADA requires an organized, cohesive plan to

remediate inaccessible pedestrian pathways. Logically, this requires an organized, cohesive plan

to fund the necessary remediation. The City's reliance on vague funding schemes to haphazardly

repair and maintain its pedestrian pathways is insufficient, and ensures that the program will forever remain inaccessible for Plaintiffs.

The City has the ability to adequately remediate inaccessible pathways and keep them clear from snow, ice, and other barriers, but has chosen the path of least resistance – ignoring its duty to create and follow a transition plan that accurately identifies areas of ADA-noncompliance and to properly fund the remediation of noncompliant sidewalks, curb cuts, and crosswalks. It has relied upon a slapdash system of renovation and response to complaints based on which areas are "the worst" for far too long. SMF ¶ 106.

The City does not remediate sidewalks and curb cuts on its own property to comply with minimum ADA compliance. SMF ¶ 107-110. This includes the areas which were originally identified by Plaintiffs as inaccessible and were subsequently "remediated." These locations – including the scene of Mr. Lugo's accident, the curb cut and ramp outside City Hall, the Centers for Economic Opportunity, and the sidewalk on Riverside Park – continue to be inaccessible and noncompliant with the ADA. SMF ¶ 118-124. These haphazard renovations frequently fail to bring even the targeted areas into actual compliance with the ADA.

The City's inconsistent code enforcement protocols fail to ensure pedestrian rights of way on private property are maintained in a manner that complies with either the ADA or City Codes. SMF ¶ 59-87. Without proper enforcement, applicable law is useless. If the City is not held accountable for maintaining their pedestrian pathways in an accessible manner, the problems Plaintiffs face will never get resolved.

The ADA does not permit the City to skirt its compliance requirements. The City has discriminated against Plaintiffs for far too long. The City must provide pedestrian pathways Plaintiffs can use independently and safely like other pedestrians without mobility disabilities.

C. *Plaintiffs Are Entitled to Summary Judgment*

All material facts in this case are undisputed. Plaintiffs pled specific and detailed facts, proved uncontested by the record. Fed. R. Civ. P. 56(c)(1)(A).

The undisputed materials facts show that Mr. Lugo and Ms. Seaton suffered and continue to suffer injury in fact as a result of barriers, obstructions, cracks, and potholes in the City's pedestrian pathways. They also showed that Plaintiffs are at risk of future injury so long as the pedestrian pathways remain inaccessible. The undisputed facts further demonstrate that the City is aware of its inaccessible sidewalks and that it is responsible for resolving the issue of ADA-noncompliance. SMF ¶ 50.

There is no dispute that Plaintiffs are "qualified individuals" with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2). Nor is there any dispute that the City is a "public entity" that must be held liable for failures to accommodate persons with disabilities. 42 U.S.C. §§ 12131(1)(A); (B). The law is clear that pedestrian pathways in the City, which include sidewalks, curb cuts, and crosswalks, are a "service, program, or activity" within the meaning of 28 C.F.R. § 35.149. It is uncontroverted that the City's pedestrian pathways are inaccessible to Plaintiffs because of their disability.

Both the Plaintiffs' expert witness and the City's engineer concurred materially to the accuracy of the sidewalk and curb cut measurements in Plaintiff's Expert report and rebuttal, and agree that the inspected locations are inaccessible because they are ADA-noncompliant. SMF ¶ 107-124. To the extent that any factual dispute may exist regarding the barriers in question, the dispute does not rise to the level a "genuine issue of material fact." *Anderson* at 248.

Having shown that there is no genuine issue of material fact, Plaintiffs are entitled to summary judgment in its favor.

22

## VI.   Conclusion

Plaintiffs ask the Court to fulfill the ADA's purpose of "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The "accommodations sections of Title II will be meaningless, and social costs will be aggravated," if people who use wheelchairs "are not afforded the opportunities to travel safely on and between streets." *Scharff*, 2014 WL 2454639, at *7. The City's pedestrian pathways should be accessible to all, and Defendant's disregard of accessibility, extraordinarily slow and haphazard fixes to pedestrian pathways, and remediation efforts that fail to contemplate minimum accessibility compliance are precisely the type of discrimination that the ADA and Section 504 are meant to eliminate. Without proper enforcement of these civil rights laws, people with disabilities will never be able to participate equally and independently in society. Plaintiffs are entitled to full Summary Judgment in their favor, and the relief sought in their Complaint. ECF.1 at 12-13.

December 15, 2021

Attorneys for Plaintiff
DISABILITY RIGHTS NEW YORK
Amanda Pearlstein
Christina Asbee
725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861

23